# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| SCOTT DEMUTH, ALEXANDER LUNDBERG, CELIA KUTZ, NATHAN CLOUGH, VINCENT COLLURA, and ANDREW FAHLSTROM, *individuals*, | Civil No. 08-5093 (JRT/LIB) |

Plaintiffs,

v.

ROBERT FLETCHER, *individually and in his official capacity as Ramsey County Sheriff*, INSPECTOR SAMEC, *individually and in his official capacity as Deputy of the Ramsey County Sheriff's Department*, COMMANDER RICH CLARK, *individually and in his official capacity as Deputy of the Ramsey County Sheriff's Department*, COMMANDER SOMMERHAUSE, *individually and in his official capacity as Deputy of the Ramsey County Sheriff's Department*, COUNTY OF RAMSEY, *a Minnesota municipal entity* CERTAIN AND UNKNOWN AND UNNAMED SAINT PAUL POLICE OFFICERS, CITY OF SAINT PAUL, CERTAIN UNKNOWN AND UNNAMED CITY OF MINNEAPOLIS POLICE OFFICERS, and CITY OF MINNEAPOLIS, *a Minnesota municipal entity*,

**MEMORANDUM OPINION AND ORDER**

Defendants.

Albert T. Goins, Sr., **GOINS LAW OFFICES, LTD.**, Grain Exchange Building, Suite 378, 301 Fourth Avenue, Minneapolis, MN 55415;; Teresa J. Nelson, **ACLU OF MINNESOTA**, 2300 Myrtle Avenue, Suite 180, St. Paul, MN 55114; and Geneva E. Finn **INSTITUTE ON RACE AND POVERTY**, 229 19th Avenue South, Suite 190, Minneapolis, MN 55455, for plaintiffs.

Jason M. Hiveley, Jon K. Iverson, and Stephanie A. Angolkar, **IVERSON REUVERS, LLC**, 9321 Ensign Avenue South, Bloomington, MN 55438, for defendants.

Defendants Robert Fletcher, Tony Samec, Dale Sommerhause, and Rich Clark ("defendants") executed search warrants at various locations in August 2008 in relation to alleged illegal activity undertaken by members of a group known as the Republican National Convention Welcoming Committee ("RNCWC").  Defendants seized a large quantity of documents and other items, some of which allegedly belongs to plaintiffs Scott Demuth, Alexander Lundberg, Celia Kutz, Nathan Clough, Vincent Collura, and Andrew Fahlstrom ("plaintiffs").  Because defendants seized materials not explicitly described or logically accounted for in the relevant search warrants, and because plaintiffs' First and Fourth Amendment rights were clearly established, the Court denies defendants' motion for summary judgment as to the question of qualified immunity.  However, because plaintiffs have failed to raise a genuine issue of material fact as to their claims of conspiracy and under *Monell*, the Court grants the motion on the remainder of plaintiffs' claims.  Also, because plaintiffs have not demonstrated actual success on the merits of their case, the Court denies their separate motion for partial summary judgment and will not issue an order for preliminary or permanent injunctive relief.

## BACKGROUND

## I.    REPUBLICAN NATIONAL CONVENTION WELCOMING COMMITTEE

Plaintiffs are alleged co-owners of various materials seized by police officers during a raid of several buildings in 2008, prior to the Republican National Convention

("RNC").  Kutz, Fahlstrom, and Clough were members of a collective known as the RNCWC which raised funds to rent space to congregate, share ideas, and organize various protest activities related to the RNC.  The RNCWC provided space and tables to allow the distribution of their own literature, as well as the literature of other groups and activists.  The RNCWC intended to shut down the RNC to prevent it from occurring, and to prevent delegates from arriving at the RNC's location.  (Fletcher Dep. 20:13-21:5, June 19, 2009, Angolkar Aff. Ex. C, Docket No. 59.)  Kutz and Lundberg were also members of the "Northstar Health Collective," a group whose aim was allegedly to provide wellness information for activists at the RNC.  Demuth was present when the seizures at issue in this case occurred and had intended to distribute pamphlets to others during the RNC.  Collura intended to protest the RNC and was handcuffed and searched during the execution of one of the warrants. .

## II.    POLICY AND INVESTIGATION

In August 2007 the Ramsey County Sheriff's Office ("RCSO") adopted a crime prevention intelligence policy to address surveillance of domestic organizations, and information gathering and intelligence related to First Amendment activities.  (RCSO Policy, Angolkar Aff. Ex. B.)  The policy was developed in response to news reports that an "anarchist" group or groups intended to disrupt the RNC, including through unlawful acts.  (Fletcher Dep. 20:12-25.)  The policy explicitly states that the "RCSO will not initiate or participate in investigations or information gather[ing] operations on groups or individuals based solely upon the lawful exercise of their constitutional

rights."   (RCSO Policy at 157.05(I).)   However, "Department policy requires investigations or information gathering operations that involve the First Amendment activities of individuals or groups shall be based on an existing criminal predicate or the reasonable suspicion that unlawful acts have occurred or may occur." (*Id.*)  The policy also provides that if the RCSO learns of oral or written communications advocating unlawful activity or an apparent intent to engage in unlawful conduct, particularly acts of violence, an investigation is warranted.  (*Id.* at 157.05(II).)  Sheriff Robert Fletcher ("Fletcher") testified that the policy was developed by current and former members of various police departments, each of whom had relevant experience and training, including experience with in the Code of Federal Regulations, and past experience developing such policies.  (Fletcher Dep. 32:23-33:21.)

After the policy was adopted, the RCSO began investigating the RNCWC.  The investigation was initiated by what the RCSO describes as a reasonable suspicion that persons associated with the RNCWC were conspiring to engage in criminal activity in Ramsey County and elsewhere in Minnesota leading up to and during the RNC in St. Paul.  (627 Smith Search Warrant App. at 1-4, Sommerhause Aff. Ex. A, Docket No. 58.)  In July 2008, investigators learned that the RNCWC had rented a commercial building located at 627 Smith Avenue South in St. Paul, Minnesota (the "Convergence Center").  (*Id.* at 8.)  A confidential informant attending a meeting of the RNCWC learned that some of the leaders of the group had rented the Convergence Center to be used as a coordination center for "anarchist related activities during the RNC." (*Id.* at 14.)  An undercover officer was told that the lease was signed on behalf of Betsy

Raasch-Gilman, on behalf of the Jack Pine Community Center in Minneapolis, to allow contributions to the lease to be tax deductible.  (*Id.*)  On August 15, 2008, the RCSO began surveillance of the Convergence Center, and on August 28, a confidential informant received documents from that location, including statements articulating allegedly criminal intent, criminal direction, and criminal instruction.  (*Id.* at 14.)  The documents' titles include:

- RNC Welcoming Guide
- Radical Defense
- Don't Back Down
- Heartcheck
- Hack This Zine; Notes from the Hacker Underground

(*Id.* at 17.)  The documents include statements such as "EVERYTHING YOU NEED TO KNOW TO BE SMART AND DANGEROUS DURING THE RNC BEFORE YOU ASK," and explicit instructions for making a Molotov cocktail.  (*Id.* at 15-16.)  The RNC Welcoming Guide includes information about targeting hotels and bridges, and seizing spaces through blockading methods.

## III.   WARRANTS

On August 29, 2008, Inspector Tony Samec, Commander Dale Sommerhause, and Commander Rich Clark of the RCSO applied for and received a warrant to search for assembled and unassembled bombs and materials to construct bombs, documents, and other materials at the Convergence Center.   The application and resulting warrant described a variety of weapons and materials the affiants believed would be found there, including "[a]ssembled improvised incendiary devices . . . [i]gnitable liquids . . . [s]moke

bombs . . . [and] [m]anuals, books and/or instructions for the construction of Molotov cocktails, bombs and other direct action techniques[.]"  (627 Smith Search Warrant App. at 1.)  The warrant also authorized a search for "documents that plan, promote and/or advocate criminal activity, rioting, damage to property . . . documents and other communication with other RNCWC [] group members and individuals from affinity groups."  (627 Smith Search Warrant, Sommerhause Aff. Ex. B.)  The application for the warrant included the following:

> A nighttime search of the residence outside the hours of 7 AM and 8 PM is requested because your Affiant believes that a search outside these hours and under the cover of darkness provides the best approach for the safety of the officers executing the warrant . . . An unannounced entry is not requested.

(*Id.*)  However, this language was not included in the warrant signed by the state court judge.  Defendants characterize the omission as a clerical error.

The officers also obtained warrants to search for similar items at the premises and motor vehicles at 2301 23rd Avenue South, 3240 17th Avenue South, and 3500 Harriet Avenue South.  (Sommerhause Aff. Exs. D, F, H.)   These warrants also authorized a search of the persons and residences of RNCWC leaders Robert Czernik, Garrett Fitzgerald, Monica Bicking, Eryn Trimmer, and Max Specktor, none of whom are parties to this action.  (*See* 627 Smith Search Warrant.)  The warrant applications for each location detailed various documents the officers expected to find, including the RNC Welcoming Guide, Radical Defense, Don't Back Down, and Heartcheck.

IV.    SEARCHES

A.    627 Smith

On August 29, 2008, at 9:15 pm, the RCSO and St. Paul Police Department executed a search warrant at the Convergence Center.  (Sommerhause Dep. 64:2-17, Mar. 29, 2010, Angolkar Aff. Ex. F.)  The warrant was originally planned to be executed the next day; however, St. Paul Police Chief Harrington requested that Sheriff Fletcher execute the warrant as soon as possible because the St. Paul Mayor had been receiving complaints from neighbors.  (Fletcher Dep. 114:22-115:11.)  Sommerhause conducted a pre-raid briefing at which he read the warrant to the raiding officers, let them look at the warrant, and specifically told them not to take documents that may be protected by attorney-client privilege.  (Sommerhause Dep. 169:4-12.)  They did not knock and announce their authority before entering the building.  (Sommerhause Dep. 162:12-14.) Sommerhause testified that though the warrant did not excuse the raiding officers from the requirement of knocking and announcing their presence, when the officers approached the building "it became clear that they [occupants of the Convergence Center] were not going to be cooperative and they attempted to slam the door on us." (*Id.*)  He also stated that the police need not knock and announce if the officers believe the individuals inside a place to be searched will destroy evidence.  (*Id.* 163:18-19.)

There were approximately sixty-eight people inside the Convergence Center when the search warrant was executed.  (Incident Report, Angolkar Aff. Ex. H.)  Once the area was secured, members of the RCSO entered and began identifying and releasing parties. The officers also took videos and photographs of documents within the Convergence

Center, which show large amounts of literature set out on tables.  Plaintiffs Scott Demuth,

Andrew Fahlstrom, Nathan Clough, Celia Kutz, and Alexander Lundberg claim that

documents they co-owned were seized as part of the search, including:

- Demuth: 25-50 copies of two pamphlets, titled *Oka* and *Ts'Peten*.

- Fahlstrom, Clough and Kutz: copies of *Wash Your Own Dishes*, *RNC Welcoming Guide*, *Crash the Convention*, and *Turbulence*.

- Kutz:  copies of *Don't Back Down*, *An Activist's Guide to Basic First Aid*, *Crash the Convention*, *Wellness at the RNC*, *No RNC*, and *Staying Safer in the Streets*.

Clough asserts that though he was not present at the Convergence Center when the

warrant was executed, as a member of the RNCWC he was a joint owner of materials

seized by the police.   Clough asserts that the materials seized were meant to be

distributed in the period leading up to and during the RNC, and that such use was

prevented by the nearly wholesale confiscation of the materials by the RCSO.   Two

weeks after the execution of the Convergence Center warrant, two officers from the

RCSO went to Clough's home and allegedly implied that he could be removed as a

graduate student from the University of Minnesota for his involvement with the

RNCWC.

Sommerhause testified that when the officers executed the search, they did not

read each document, but they did leave behind documents specific to the National

Lawyer's Guild, and other documents that appeared to be protected by the attorney-client

privilege.  (Sommerhause Dep. 116:3-22.)   Sommerhause also testified that there were

"hundreds, if not thousands of documents located in [the Convergence Center].   Many

documents were mixed together with other documents and each specific page was not gone through at the time [the warrant was executed]." (*Id.* 119:4-7.)  Sommerhause testified that there were time constraints on the officers' ability to review all the documents in the Convergence Center because there was a large crowd gathering outside, and he was concerned for his officers' safety.  (*Id.* 125:15-17.)  According to Sommerhause, it would have taken a week to go through all of the documents in the Convergence Center.  (*Id.* 130:15-16.)  However, after a short review following the seizure, Sommerhause testified that "[w]e felt that all the documents that we seized fell within the parameters of the search warrant."

### B.      3240 17th Avenue South

On August 30, 2008, at approximately 7:49 am, Minneapolis Police officers and officers from the RCSO executed a search warrant at 3240 17th Avenue South in Minneapolis.  (Incident Report 3240 17 Ave. S. at 3, Clark Aff. Ex. A, Docket No. 57.) Among the thirteen individuals located in the residence was plaintiff Alexander Lundberg.  (Clark Aff. ¶ 3.)  Monica Bicking, Eryn Trimmer, and Garrett Fitzgerald were arrested for conspiracy to commit riot, conspiracy to commit criminal damage to property, and conspiracy to commit civil disorder.  (Incident Report 3240 17 Ave. S. at 5.)  Lundberg asserts ownership over items seized during the execution of the warrant including ropes, harnesses, carabiners, a knife, and a filter mask.  Lundberg also asserts that he was a co-owner with the Northstar Health Collective of boxes of literature described by the police as "propaganda," including "An Activist's Guide to Basic First

Aid," "Wellness at the RNC," "Staying Safer in the Streets," and "Supporting Survivors of Sexual Assault." (Lundberg Dep. 29-34, Angolkar Aff. Ex. N.) Lundberg also claims that authorities seized Northstar business cards.

### C.  2301 23rd Avenue South

On August 30, 2008, at approximately 8:00 am, the Minneapolis Police Department and the RCSO executed a search warrant at 2301 23rd Avenue South in Minneapolis. (Incident Report 2301 23rd Ave S., Sommerhause Aff. Ex. I.) The warrant authorized a search of the property, a detached garage, and Robert Joseph Czernik. (2301 23rd Ave. S. Search Warrant, Sommerhause Aff. Ex. D.) Plaintiff Demuth was among the twelve individuals detained in the residence. (Incident Report 2301 23rd Ave. S.) Commander Soukkala presented a copy of the warrant to Demuth, who read it out loud. (*Id.*) Among the items seized from the residence, Demuth claims ownership of a laptop computer, cell phone, digital camera, audio cassettes, eight two-way radios, six throwing knives, two hunting knives, a brass knuckle belt buckle, a .22 caliber revolver that Demuth claims is inoperable, a compound bow and six arrows, and boxes of anarchist literature. Demuth also claims that the police seized approximately four hundred copies of a children's story-book, and a box of political books by various authors.

### D.  3500 South Harriet Avenue

On August 30, 2008, at 8:00 am, officers executed a search warrant at 3500 South Harriet Avenue. (Incident Report 3500 S. Harriet Ave., Samec Aff. Ex. A, Docket No. 56.) Officers located several weapons, including "ninja foot spikes," a slingshot, and

documents relating to the RNC.  (*Id.* at 4-5.)  Plaintiff Vincent Collura alleges that after entering the house, police ordered him to lie on the floor, where he was handcuffed and searched, then was unbound and taken outside approximately a half-hour later.

Collura testified that he resided at the residence at the time of the search, and shared a bedroom with Max Specktor.  Collura also asserts ownership of a two-page address and phone list, from which he was transferring phone numbers into a new cell phone, that was seized by officers effectuating the warrant.  Collura testified that the raid had a chilling effect on his desire to participate in the planned protests of the RNC for fear of further interactions with the police.  (Collura Dep. 54:5-7, Apr. 30, 2010, Angolkar Aff. Ex. P.)

## V.      PROCEDURAL HISTORY

From evidence gathered by the various searches and seizures, eight individuals – Garrett Fitzgerald, Rob Czernik, Max Spektor, Monica Bicking, Eryn Trimmer, Eric Oseland, Nathanael Secor, and Luce Guillent-Givins ("criminal defendants" or "RNC 8") – were charged with conspiracy to commit criminal damage to property, conspiracy to riot, and various other charges.  While criminal charges were pending against the RNC 8, plaintiffs in this case brought a lawsuit in state court to regain the documents seized during the various warrant executions.  (Case No. 62-CV-08-0874, Second Angolkar Aff. Ex. C, Docket No. 69.)  Plaintiffs filed a motion seeking the return of documents under Minn. Stat. § 626.21, which provides:

> A person aggrieved by an unlawful search and seizure may move the district court for the district in which the property was seized or the district

court having jurisdiction of the substantive offense for the return of the property and to suppress the use, as evidence, of anything so obtained on the ground that (1) the property was illegally seized, or (2) the property was illegally seized without warrant, or (3) the warrant is insufficient on its face, or (4) the property seized is not that described in the warrant, or (5) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (6) the warrant was illegally executed, or (7) the warrant was improvidently issued.

A hearing was held in Ramsey County District Court on September 2, 2008, at which the state court judge denied plaintiffs' requested relief.  (Second Angolkar Aff. Ex. D.)  Plaintiffs filed this action on September 3, 2008, and the case is before the Court on the parties' cross-motions for summary judgment and partial summary judgment.

## ANALYSIS

## I.  STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   UNNAMED AND UNINVOLVED OFFICERS

Plaintiffs have not named any officers other than those listed in the complaint, and defendants' motion for summary judgment asks that claims against any unknown officers be dismissed.   Plaintiffs do not object, thus "certain unknown and unnamed Saint Paul Police Officers, including officers John Doe and Jane Roes 1 thru 100" and "certain unnamed and unknown City of Minneapolis Police Officers, including officers John Doe and Jane Does 1 thru 100," are dismissed as defendants from the case.

## III.   CONSPIRACY AND FAILURE TO PREVENT

The complaint alleges that individual officers and Sheriff Fletcher conspired to deprive plaintiffs of their constitutional rights in violation of 42 U.S.C. § 1985(3). (Compl. ¶ 1, Docket No. 1.)  To demonstrate a civil rights conspiracy under 42 U.S.C. § 1985, the plaintiffs must prove:

> (1) the defendants conspired; (2) with the intent to deprive them, either directly or indirectly, of equal protection of the laws, or equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) that they or their property were injured, or they were deprived of exercising any right or privilege of a citizen of the United States.

*Barstad v. Murray Cnty.*, 420 F.3d 880, 887 (8th Cir. 2005); *see also Feist v. Simonson*, 36 F. Supp. 2d 1136, 1150 (D. Minn. 1999) ("To prove [a conspiracy to violate civil rights], Plaintiff[s] must allege specific facts indicating a mutual understanding among the conspirators to take actions **to an unconstitutional end**." (emphasis added)).  "For a claim of conspiracy . . . , the plaintiff need not show that each participant knew 'the exact limits of the illegal plan . . . ,' but the plaintiff must show evidence sufficient to support

the conclusion that the defendants reached an agreement to deprive the plaintiff of constitutionally guaranteed rights." *White v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008) (quoting *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996)).   The Court should not take the question of the existence of such a conspiracy from the jury if a jury could find there was a meeting of the minds.   *Id.*   ("The question of the existence of a conspiracy to deprive the plaintiffs of their constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." (quoting *Miller*, 76 F.3d at 1458)).

Plaintiffs suggest that the seizure of documents allegedly protected by the First Amendment during the execution of the various search warrants indicates a highly orchestrated operation originating at the policymaker level of the RCSO, constituting a conspiracy to deprive plaintiffs of their civil rights.   Plaintiffs further argue that the wording of the warrants, allowing for the seizure of documents promoting or advocating criminal activity, disregards their First Amendment rights.

The circumstantial evidence of a conspiracy, as alleged by plaintiffs, consists of: an allegedly overbroad search warrant authorizing the seizure of protected literature, the officers' excessively broad interpretation and execution of the warrant, and the Sheriff's decision to keep all of the documents after their seizure.   None of this evidence supports the assertion that there was a meeting of the minds, or any intent, on the part of any officer to deprive any plaintiff of his constitutional rights.   The seizures were the result of a year-long investigation, extensive reports and documentation, and detailed warrant

applications.   The fact of an investigation into criminal activity is not evidence of a conspiracy to violate civil rights, nor is a warrant authorizing the seizure of documents from individuals believed to be producing materials related to unlawful behavior evidence of a conspiracy.   At worst, the search warrant was excessively broad in its description of documents likely to be found and defendants likely exceeded the broad scope of the warrant during its execution.   Though these are serious issues, the Court does not find evidence of a conspiracy.

Further, the Supreme Court has found that because § 1985(3) is intended to preserve equal protection under the law, it requires a plaintiff to establish "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."   *United Bhd. of Carpenters and Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1983) (internal quotation marks omitted).   Though plaintiffs argue that they, as opponents to the RNC and members of various political groups, were targeted as a protected class, no evidence exists suggesting such a bias.   Because there are insufficient facts to raise a genuine issue of material fact as to conspiracy, the Court grants defendants' motion for summary judgment as to plaintiffs' conspiracy claims.

"A section 1986 claim must be predicated upon a valid section 1985 claim." *Gatlin v. Green*, 362 F.3d 1089, 1095 (8th Cir. 2004).   Because the Court finds no violation of § 1985(3), the Court also grants defendants' motion for summary judgment on plaintiffs' § 1986 claim.

## IV.   *MONELL* CLAIM

Under 42 U.S.C. § 1983, a governmental entity may not be held vicariously liable for the unconstitutional acts of its employees.  *Dahl v. Rice Cnty.*, 621 F.3d 740, 743 (8th Cir. 2010); *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  However, a governmental entity may be held liable if a plaintiff proves that its policy or custom was the "moving force [behind] the constitutional violation."  *Monell*, 436 U.S. at 694.  A policy can be inferred from a single **decision** taken by the highest officials responsible for setting policy in that area of the government's business.  *City of St. Louis v. Praprotnik,* 485 U.S. 112, 123 (1988).  However, "[p]roof of a single **incident** of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."  *City of Okla. City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (emphasis added).

The Eighth Circuit does not use the terms "policy" and "custom" interchangeably when conducting a *Monell* analysis.  *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999).  "Rather, a 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters."  *Id.*; *see also Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998).  To establish the existence of a municipal custom, a plaintiff must demonstrate: (1) the existence of a widespread, continuing pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to, or tacit authorization of such conduct by the governmental entity's policymaking officials

- 16 -

after notice to the officials of that misconduct; and (3) that plaintiffs were injured by acts pursuant to the governmental entity's custom. *Thelma D. ex. rel. Delores A. v. Bd. of Educ.*, 934 F.2d 929, 932-33 (8th Cir. 1991).

Though a single instance of a violation of rights based on an unconstitutional policy can be sufficient to support a claim under *Monell*, plaintiffs have not demonstrated, or even suggested how, any policy put forth by Fletcher or the RCSO is itself unconstitutional, or how that policy motivated unconstitutional conduct. The RCSO policy specifically provides that the "RCSO will not initiate or participate in investigations or information gather [*sic*] operations on groups or individuals based solely upon the lawful exercise of their constitutional rights." (RCSO Policy at 157.05(I).) However, "Department policy requires investigations or information gathering operations that involve the First Amendment activities of individuals or groups shall be based on an existing criminal predicate or the reasonable suspicion that unlawful acts have occurred or may occur." (*Id.*) A review of the policy does not reveal any provision that would likely lead to unconstitutional conduct or a deprivation of rights. The policy carefully defines the boundaries of conduct, and specifically discusses the relevant rights to be protected. Plaintiffs have produced no evidence of a persistent or widespread pattern of unconstitutional conduct founded on this policy. Though multiple warrants were executed pursuant to an investigation based on the policy, even if unconstitutional actions took place during or because of the execution of the warrants, no reasonable fact-finder could conclude that the policy itself was the precipitating factor.

Further, there is no evidence that any policy-maker acted with "deliberate indifference" to the rights of plaintiffs. Though protected documents may have been included in the seizures, such violations were not the result of any fault in the policy, or the creation of the policy. Thus, the Court grants summary judgment to defendants on plaintiffs' *Monell* claim.

## V.    42 U.S.C. § 1983

Defendants argue that plaintiffs' constitutional claims under 42 U.S.C. § 1983 cannot be prosecuted because the defendants lack standing to bring such claims, and qualified immunity protects them from suit. Because the Court finds that plaintiffs have standing, and that a reasonable fact-finder could conclude that constitutional violations of clearly established rights occurred, qualified immunity does not apply to defendants.

### A.    Standing

Defendants argue that plaintiffs lack standing to challenge the search warrants. Plaintiffs argue that they have standing on two grounds: (1) ownership and privacy interests in the various locations searched; and (2) that the seizure and continued retention of materials in which plaintiffs claim an ownership interest constitutes an injury as a prior restraint of their rights under the First Amendment. Plaintiffs also argue that there is a "credible threat of prosecution" in the future for various plaintiffs, which also confers standing.

The constitutional minimum for standing under Article III requires the following three elements: "an injury in fact, meaning the actual or imminent invasion of a concrete

and particularized legal interest; a causal connection between the alleged injury and the challenged action of defendant; and a likelihood that the injury will be redressed by a favorable decision of the court." *Sierra Club v. Kimbell*, 623 F.3d 549, 556 (8th Cir. 2010); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In Fourth Amendment challenges, such as those brought in this case, whether a defendant has standing to challenge a search depends on whether he had a subjective and reasonable expectation of privacy in the area searched or the items seized. *See Minn. v. Carter*, 525 U.S. 83, 88-89 (1998). The person challenging the search bears the burden of establishing a subjective expectation of privacy and that the expectation is objectively reasonable, meaning one that society is willing to expect. *See Minn. v. Olson*, 495 U.S. 91, 96-97 (1990). "The Fourth Amendment protects against unreasonable searches and seizures, but its protections are personal and cannot be asserted by persons lacking a legitimate expectation of privacy in the place searched." *United States v. Wiest*, 596 F.3d 906, 909 (8th Cir. 2010) (internal quotation marks omitted). "[S]tatus as an overnight guest is alone enough to show that defendant had an expectation of privacy in the home that society is prepared to recognize as reasonable." *Id.* (internal quotation marks omitted).

Though defendants argue that plaintiffs have provided no proof they resided in the addresses subjected to the searches, Demuth, Collura, and Lundberg have each offered sufficient evidence to provide standing to challenge the searches of their residences. Demuth described a room at 2301 23rd Ave South as "his bedroom" in which he had school papers and a laptop. (Demuth Dep. 145:14-146:3, Nelson Aff. Ex. 5, Docket

No. 78.)  Vincent Collura testified that he was a resident at 3500 Harriet Avenue South when the warrant was executed at that location.  (Collura Dep. 14:20-25, 17:10-14, Nelson Aff. Ex. 3.)  Though the incident report suggests that Collura resides at an address in Wisconsin, he testified that that is his parents' address and is not where he lives.  Further testimony suggests that he considers 3500 Harriet Avenue South his "home."  (*Id.*)  Lundberg testified that he resided in 3240 17th Avenue South, and a number of items he describes as his belongings were seized, including ropes, carabineers, and knives.  (Lundberg Dep. 29-34, Angolkar Aff. Ex. N.)  Because Demuth, Collura, and Lundberg have each testified that they considered the above addresses their residences, and have testified that they suffered an injury in fact when their possessions were seized and have not yet been returned, the Court finds that they had reasonable expectations of privacy and standing to challenge the searches of their residences.

Plaintiffs Demuth, Kutz, Fahlstrom, and Clough argue that they have standing to challenge the legitimacy of the search of the Convergence Center because it was rented and occupied by the RNCWC, of which they were members, and because they brought and left their own documents there.  The Supreme Court "long has recognized that the Fourth Amendment's prohibition on unreasonable searches and seizures is applicable to commercial premises, as well as to private homes."  *New York v. Burger*, 482 U.S. 691, 699 (1987).  However, "[an] expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home."  *United States v. Hill*, 393 F.3d 839, 841 (8th Cir. 2005) (quoting *Burger*, 482 U.S. at 699).  Factors relevant to the determination of standing include:

ownership, possession and/or control of the area searched; historical use of the property; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.

*United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

Kutz, Fahlstrom, and Clough rest their standing argument on a connection between membership in the RNCWC and an expectation of privacy in the facility rented by the RNCWC. Plaintiffs' connections include a donation by Fahlstrom to the RNCWC which may have been put towards the rent, and ownership or control of documents seized by defendants from the Convergence Center. Although they were not signatories to the lease, the space was clearly rented for, among other purposes, housing and distributing documents like those Demuth, Kutz, Fahlstrom, and Clough brought to the Convergence Center. The Court finds that the purpose of renting the Convergence Center, and the nature of the documents defendants brought and left there, suggest an expectation of privacy that society is prepared to recognize as reasonable.

In addition, the claimed ownership of documents at the Convergence Center provides plaintiffs standing to assert claims for violations of First Amendment rights based on the seizure and retention of those documents by defendants. *See New York Times Co. v. United States*, 403 U.S. 713, 714 (1971). As plaintiffs were harmed by the seizure (though to what extent is unclear), and as many of the materials seized were unquestionably protected by the First Amendment, plaintiffs have standing to assert a violation of their First Amendment rights.

Plaintiffs also argue in their brief for partial summary judgment that because they may be charged with "something" they have standing. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988) (pre-enforcement nature of the suit irrelevant where plaintiffs alleged actual and well-founded fear that a statute will be enforced against them, and the Court had no reason to assume otherwise). Plaintiffs have not identified any statute under which they are or may be facing criminal prosecution. In fact, no evidence in this case suggests that plaintiffs will be subject to prosecution, particularly where five other individuals have already been prosecuted, the events giving rise to this case happened more than two years ago, and no charges have been filed against any plaintiff. As such, the Court finds that none of the plaintiffs have standing based on the threat of imminent prosecution. Thus, Demuth, Collura, and Lundberg have standing to challenge the searches of their respective residences, and Demuth, Kutz, Fahlstrom, and Clough, have standing to challenge the searches of the Convergence Center.

### B.    Qualified Immunity

Defendants argue that they are protected by qualified immunity and are thus entitled to summary judgment. Because qualified immunity is "**an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.**" *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis original). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery . . . ." *Anderson v. Creighton*, 483 U.S. 635, 640 n.2 (1987).

Accordingly, "[the Supreme Court] repeatedly [has] stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

This Court considers two questions to determine whether the officials are protected by qualified immunity: (1) whether the facts plaintiffs have alleged or shown, when viewed in their favor, support a finding that the conduct of the officers violated a constitutional right, and (2) whether that constitutional right was "clearly established" at the time of the incidents such that a reasonable officer would have known that his or her actions were unlawful. *Pearson v. Callahan*, 129 S. Ct. 808, 815–16, 818 (2009) (holding that courts may exercise discretion in determining which of the two prongs to address first); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001). "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8th Cir. 2009).

Plaintiffs allege that Sheriff Fletcher and individual officers violated their First and Fourth Amendment rights to free speech, assembly, and redress of grievances, through an overbroad search warrant, an execution of the warrant exceeding its specific terms, and seizing documents protected by the First Amendment. (Compl. ¶¶ 23-24.) The Court finds that although the warrant was valid, the manner in which defendants effectuated the seizures could constitute violations of plaintiffs' rights under the Fourth and First Amendments, which rights were clearly established at the time of defendants' actions.

### 1.      Fourth Amendment

The Fourth Amendment requires that a warrant "particularly describ[e] the . . . things to be seized."  U.S. Const. amend. IV. This requirement precludes the issuance of a warrant that permits a "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).  "Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with 'scrupulous exactitude.'"  *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (1978); *United States v. Apker*, 705 F.2d 293, 300-01 (8th Cir. 1983) (quoting *Stanford v. Texas*, 379 U.S. 476, 485 (1965)).  "To satisfy the demand for particularity, a warrant 'must describe the objects of the search with reasonable specificity, but need not be elaborately detailed.'"  *United States v. Vitek Supply Corp.*, 144 F.3d 476, 481 (7th Cir. 1998) (quoting *United States v. Shoffner*, 826 F.2d 619, 630 (7th Cir. 1987)).  "Where the precise identity of goods cannot be ascertained at the time the warrant is issued, naming only the generic class of items will suffice because less particularity can be reasonably expected than for goods . . . whose exact identity is already known at the time of issuance."  *United States v. Dennis*, 625 F.2d 782, 792 (8th Cir. 1980) (quoting *United States v. Johnson*, 541 F.2d 1311, 1314 (8th Cir. 1976)).  The Eighth Circuit has upheld numerous seizures predicated on warrants, and warrant applications, describing general categories of things to be seized.  *See, e.g.*, *Dennis*, 625 F.2d at 792 (search warrant for "certain books and records" relating to crimes not overbroad and acceptable because exact identity of evidence to be seized was not known at time of issuance); *United States v. Horn*, 187 F.3d 781, 788 (8th Cir. 1999) ("[T]he

- 24 -

words '[r]ecords, documents, receipts . . .' were sufficiently particular to preclude the exercise of any illegal discretion by the executing officers.").

Indicia search warrants are warrants for obtaining indicia of membership in a certain organization, which were included in the warrants issued in this case. *See Apker*, 705 F.2d at 296. The implication of protected First Amendment **associational** rights also requires the scrupulous exactitude standard. *Id.* at 301.

As described above, the warrants included descriptions of the following property and things:

- Assembled improvised incendiary devices . . .
- Photographs and maps of downtown St. Paul
- Manuals, books and/or instructions for the construction of caltrops, tripods, Molotov cocktails, bombs and other direct action techniques
- Documents that plan, promote and/or advocate criminal activity, rioting, damage to property
- Documents and other communication with other RNCWC[] group members and individuals from affinity groups
- Electronic devices, including, but not limited to, MP3 players (including, but not limited to iPods), X-Box gaming systems, cellular phones and personal digital assistants (PDAs)

Further, various confidential informants provided additional information about specific documents that was included in the warrant applications to show probable cause. As such, the Court finds the warrants were not overbroad, and plaintiffs' Fourth Amendment rights were not violated by the issuance of search warrants for categories of documents and things.

When considering a defendant officer's actions regarding a warrant, the Supreme Court equates qualified immunity in § 1983 actions with the good-faith exception to the

exclusionary rule. *Groh v. Ramirez*, 540 U.S. 551, 565 n.8 (2004) ("[W]e have explained that the same standard of objective reasonableness that we applied in the context of a suppression hearing . . . defines the qualified immunity accorded an officer." (internal quotation marks omitted)). Thus, when a police officer acts **within the scope** of a facially valid search warrant, issued by a judge, the officer acted in good faith in conducting the search and no violation of a constitutional right will be found. *United States v. Leon*, 468 U.S. 897, 922 (1984). However, "[i]t is incumbent on the officer executing a search warrant to ensure the search is . . . lawfully conducted." *Groh*, 540 U.S. at 563. "[P]ossession of a search warrant does not give the executing officers a license to proceed in whatever manner suits their fancy." *Hummel- Jones v. Strope*, 25 F.3d 647, 650 (8th Cir. 1994).

Plaintiffs highlight a number of documents and things seized that are well beyond the scope of the warrant, including boxes of children's books and school papers from Demuth's residence, business cards from Lundberg's residence, and documents at the Convergence Center relating to first aid and sexual assault prevention. The most cursory review of the materials would have revealed the inappropriateness of seizing them. A reasonable fact-finder could conclude that when executing the warrants, defendants went beyond their scope and seized materials that had not been enumerated, which a reasonable officer would not have seized.

## 2.      First Amendment

Plaintiffs also assert that their First Amendment rights were violated when documents were seized that were unrelated to alleged criminal activity, were not described or anticipated by the warrants, and are still being held.  *Alexander v. United States*, 509 U.S. 544, 577 (1993) ("It follows from the search cases in which the First Amendment required exacting protection, that one title does not become seizable or tainted because of its proximity on the shelf to another.").  The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.  *See New York Times Co.*, 403 U.S. at 714.  "[W]hile the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause . . . it is otherwise when materials presumptively protected by the First Amendment are involved."  *Ft. Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 63 (1989).  "It is the risk of prior restraint, which is the underlying basis for the special Fourth Amendment protections accorded searches for and seizure of First Amendment materials that motivates this rule."  *Id.* at 63-64 (citations and quotation marks omitted).  As a general matter, in order to demonstrate a First Amendment violation, a plaintiff must show that defendants attempted to deter or chill plaintiffs' speech and such deterrence was a substantial or motivating factor in defendants' conduct.  *Mendocino Envtl. Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) (quoting *Sloman v. Tadlock*, 21 F.3d 1462 (9th Cir. 1994)).

In this case, defendants seized a large quantity of materials ostensibly protected by the First Amendment, often many copies of the same document, and have retained them

for more than two years.  As discussed above in the context of the Fourth Amendment, many of the documents seized were beyond the explicit scope of the warrants, and their seizure prevented various individuals, including plaintiffs, from expressing themselves during the Republican National Convention.  Based on the volume and breadth of documents seized, a reasonable fact-finder could conclude that the purpose of such broad seizures was to deter plaintiffs' speech and to prevent them from exercising their First Amendment rights.  It is difficult, for example, to see how pamphlets relating to prevention of sexual assault could be deemed to bear any relation to potentially criminal activities.  The "scrupulous exactitude" standard exists precisely to mediate the line between a legitimate seizure of documents related to a criminal purpose, and the illegitimate seizure of documents the government would simply prefer not be disseminated.  Taking as true plaintiffs' evidence, this situation veers into the latter category.  Thus defendants' actions could be found to be a prior restraint on plaintiffs' speech, a violation of the First Amendment.

What is less clear, however, is the **extent** of the restraint.  At the hearing on these motions, plaintiffs acknowledged receiving some documents back from defendants shortly after they were seized, and some plaintiffs testified that they were still able to participate in protests and other activities with the documents.  While the extent of plaintiffs' damages is unclear, it appears to be minimal at best.  Nonetheless, the Court concludes that a material factual dispute exists as to whether defendants violated plaintiffs' rights under the Fourth Amendment by seizing materials beyond the scope of the warrant that a reasonable officer would not believe were evidence of criminal activity,

and whether they violated plaintiffs' First Amendment rights by retaining the documents, effectively creating a prior restraint on plaintiffs' ability to engage in speech.

### 3.    Clearly Established Right

Defendants argue that even if the officers violated a constitutional right, the right was not clearly established. "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). Defendants argue it was not clearly established that seizing items listed in a search warrant could be a constitutional violation, and that all of the documents and things seized by the police fell within the categories of items identified in the warrant.

A party alleging constitutional violations "need not identify a factually identical case to satisfy the 'clearly established' requirement." *Nelson*, 583 F.3d at 533. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (rejecting the argument that "an official action is protected by qualified immunity unless the very action in question has previously been held unlawful."). It is axiomatic that individuals have the right to be free from unreasonable searches and seizures, so the question is whether in this case it was clearly established that seizing nearly **all** of the documents from the Convergence Center, and miscellaneous items from residential locations, would violate the Fourth Amendment by exceeding the scope of the warrant.

The Court finds it was clearly established that at the time of the seizures, taking nearly every document, with little regard for its contents, was a violation of the Fourth Amendment as a failure to enforce the scrupulous exactitude with which the warrant was required to be drawn. *See Liston v. County of Riverside*, 120 F.3d 965, 979 (9th Cir. 1997) (property destruction after officers knew they were in the wrong house unconstitutional); *see also Tarpley v. Greene*, 684 F.2d 1, 9 (D.C. Cir. 1982) (destruction of furniture, paneling, and tape deck unconstitutional if "not reasonably necessary to effectively execute a search warrant."); *Hummel-Jones*, 25 F.3d at 650.

Further, a reasonable official could understand that, depending on the circumstances, preventing individuals from delivering a particular message would violate their First Amendment rights. "[W]hen public officials are given the power to deny use of a forum in advance of actual expression or association, the danger of [constitutionally impermissible] prior restraints [on the exercise of First Amendment rights] exists." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004) (citing *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 553 (1975)). Here, there can be no question that seizing materials protected by the First Amendment would inhibit their owners' ability to speak when they had a constitutional right to do so, and that under these circumstances, that inhibition was a violation of constitutional rights. Plaintiffs were not charged with any crime, yet had their documents and other possessions seized without return, preventing their ability to speak as planned. This conclusion is bolstered by the sheer quantity of documents seized, and the small number that were immediately returned. Thus, plaintiffs have standing to

bring claims under 42 U.S.C. § 1983, and the Court finds that defendants' qualified immunity has been overcome as to these claims.

## VI.   INJUNCTIVE RELIEF

Though styled as a "motion for partial summary judgment," plaintiffs' motion is largely one for preliminary and permanent injunctive relief.   Specifically, plaintiffs request that the Court order:

> [a declaration that] the threatened prosecution of Plaintiffs for ownership or dissemination of protected literature is unconstitutional; a permanent injunction against any further action by Defendants against Plaintiffs threatening their protected conduct; a declaration that seized materials are constitutionally protected as a matter of law under the First and Fourteenth Amendments and not evidence of any criminal wrongdoing; and a permanent injunction ordering Defendants to return all of the seized literature . . . for which Plaintiffs claim ownership or custodial responsibility.

(Mot. for Partial S.J. at 2, Docket No. 63.)  Defendants argue that plaintiffs have failed to show any likelihood of success on the merits of their claims, thus a permanent or preliminary injunction cannot be granted, nor can declaratory relief.

Defendants also argue that plaintiffs' cause of action is precluded by: the *Rooker-Feldman* doctrine, because plaintiffs already raised the constitutional issues forming the basis of their claim in state court; *Younger* abstention, because the present lawsuit seeks to interfere with ongoing criminal proceedings; and *res judicata*, because plaintiffs raised and litigated the constitutional issues at issue here in state court.

## A.     Permanent Injunction

Plaintiffs seek a permanent injunction requiring the return of seized documents, and preventing threats of prosecution from state officials.  "The standard for determining whether a permanent injunction should issue is essentially the same as the familiar standard for a preliminary injunction." *See Randolph v. Rodgers*, 170 F.3d 850, 857 (8th Cir. 1999); *see also Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987).  In a preliminary injunction,

> [a court] balances four factors to determine whether injunctive relief is warranted: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the harm to the nonmoving party if the injunction is granted; (3) the probability that the movant will succeed on the merits; and (4) the public interest.

*Fogie v. THORN Ams., Inc.*, 95 F.3d 645, 654 (8th Cir. 1996) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).  The standard is the same for a permanent injunction "with the exception that the movant must show . . . **actual success**" on the merits.  *Amoco Prod. Co.*, 480 U.S. at 546 n.12 (emphasis added).

Plaintiffs argue generally that their First Amendment rights are enforceable under 42 U.S.C. § 1983.  Plaintiffs' arguments essentially assume the fact of success on the merits.  Analysis of defendants' motion for summary judgment makes clear that though qualified immunity has been overcome, it is far from likely that plaintiffs will succeed on the merits of their suit.  The Court declines to find that plaintiffs have **actually** succeeded on the merits.  Therefore, the Court denies plaintiffs' request for permanent injunctive relief.

### B.     Declaratory Judgments

The Court declines plaintiffs' request to issue a declaratory judgment that the "threatened prosecution of Plaintiffs for possession or dissemination of the protected literature is unconstitutional" as moot, where the parties have acknowledged that no prosecution is currently pending, or has been threatened.   The Court further declines plaintiffs' request to issue a declaratory judgment that the seized materials are constitutionally protected as a matter of law, as such a declaration is unnecessary for the resolution of this matter.   (*Id.*)  The Court has determined that there is a genuine issue of material fact whether defendants' actions constituted an overbroad seizure of documents and things in violation of plaintiffs' First and Fourth Amendment rights, thus any further determination of the constitutionality of individual documents is inappropriate at this time.

### C.     Bar/Preclusion

"The *Rooker-Feldman* doctrine . . . is confined to . . . cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments."  *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).  The doctrine "stands for the general principle that, with the exception of habeas corpus petitions, lower federal courts lack subject matter jurisdiction to review state court judicial decisions."  *Prince v. Ark. Bd. of Examiners in Psychology*, 380 F.3d 337, 340 (8th Cir. 2004); *see also D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 482-83 (1983);

*Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923).  Litigants may not pursue federal claims with allegations that are "inextricably intertwined" with a state court decision.  *See Feldman*, 460 U.S. at 486.

Federal claims are inextricably intertwined with the state court judgment if they "succeed[ ] only to the extent that the state court wrongly decided the issue before it." *Lemonds v. St. Louis Cnty.*, 222 F.3d 488, 493 (8th Cir. 2000) (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987) (Marshall, J., concurring)).  The claim, however, "is not precluded if it is 'separable from and collateral to the merits of the state-court judgment.'"  *Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1034 (8th Cir. 1999) (quoting *Pennzoil*, 481 U.S. at 21).  "The claim will also not be precluded if litigants do not have a reasonable opportunity to raise their federal claims before the state court." *Prince*, 380 F.3d at 341 (internal quotation marks omitted).

In the hearing in state court, plaintiffs sought the return of documents seized by the police on August 29-30, 2008.  In the current proceeding, plaintiffs seek declaratory relief and a permanent injunction that the same documents are protected by the First Amendment and must be returned, seemingly similar relief.  However, the hearing before the state court was conducted on an emergency basis, with extremely limited time for review or presentation of evidence.  A decision was issued almost immediately, and explicitly did not rule on the constitutionality of the search warrants or the search; the court's decision was limited to whether the documents would be returned immediately.  Thus, plaintiffs did not have a reasonable opportunity to raise their federal claims in state court;  the circumstances in this case are different, and the claims now have been more

developed.   Thus, the Court concludes that the *Rooker-Feldman* doctrine does not apply here, and does not bar plaintiffs' claims.

The *Younger* abstention doctrine "directs federal courts to abstain from accepting jurisdiction in cases where equitable relief is requested and where granting such relief would interfere with pending state proceedings in such a way as to offend principles of comity and federalism." *Night Clubs, Inc. v. City of Fort Smith*, 163 F.3d 475, 477 n.1 (8th Cir. 1998) (citing *Younger v. Harris*, 401 U.S. 37, 91 (1971)).   Though defendants raised the *Younger* abstention doctrine, at the hearing on these motions counsel for both parties acknowledged that the criminal proceedings against the RNC 8 had concluded, thus *Younger* abstention is no longer a relevant consideration.

Finally, defendants argue that plaintiffs' claims are barred by *res judicata*.   Under Minnesota Law, *res judicata* absolutely bars subsequent claims when: "(1) the earlier claim involved the same set of factual circumstances; (2) the earlier claim involved the same parties or their privies; (3) there was a final judgment on the merits; and (4) the estopped party had a full and fair opportunity to litigate the matter." *Hauschildt v. Beckingham*, 686 N.W.2d 829, 840 (Minn. 2004).

Here, there has not been a final judgment on the merits in the state court proceeding.   Plaintiffs note that the order from the state court relating to the documents and other materials they seek was a result of a requested temporary restraining order, which is an emergency measure whose purpose "is to preserve the status quo until adjudication of the case on the merits." *Bio-Line, Inc. v. Burman*, 404 N.W.2d 318, 320 (Minn. Ct. App. 1987).   "The grant of a temporary injunction does not establish the law

of the case or constitute an adjudication on the merits." *Haley v. Forcelle*, 669 N.W.2d

48, 55 (Minn. Ct. App. 2003).  Because there has been no final judgment on the merits of

an earlier claim, *res judicata* does not apply.

## ORDER

Based upon all the files, records and proceedings herein, **IT IS HEREBY**

**ORDERED** that:

1.     Defendants' Motion for Summary Judgment [Docket No. 53] is

**GRANTED in part** and **DENIED in part**;

a.     The motion is **GRANTED** as to plaintiffs' claims for conspiracy,

failure to prevent, and claims under *Monell*;

b.     The motion is **GRANTED** as to claims against any unknown

officers.   The "certain unknown and unnamed Saint Paul Police Officers,

including officers John Doe and Jane Roes 1 thru 100" and "certain unnamed and

unknown City of Minneapolis Police Officers, including officers John Doe and

Jane Does 1 thru 100," are **DISMISSED with prejudice**.

c.     The motion is **DENIED** in all other respects.

2.     Plaintiffs' Motion for Partial Summary Judgment [Docket No. 51] is

**DENIED**.

DATED:  March 31, 2011              _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                   JOHN R. TUNHEIM
                                      United States District Judge